IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

TODD BLACKBURN, and SAMANTHA *
BLACKBURN,
                                    *

    Plaintiffs,

                                    *

vs.                                        CASE NO. 4:11-CV-39 (CDL)

                                    *

BAC HOME LOANS SERVICING, LP,

                                    *

    Defendant.

                                    *

<u>O R D E R</u>

The saga has become familiar:  a person tastes part of the American dream by purchasing a home; the purchase is financed by a loan which is secured by a security interest in the home; a dispute or misunderstanding arises leading to a missed payment; the situation spirals out of control; the home is lost or threatened to be lost through foreclosure; and the sweet taste of the American dream becomes a bitter after-taste flavored by distress and litigation.  The legal saga that ensues is equally familiar:  the disgruntled homeowner alleges a laundry list of causes of action to remedy the tragic loss; the lender, often relying on the documents signed by the homeowner, responds that the claims are so devoid of merit that they must be dismissed summarily without discovery or trial; and, the judge must unravel the claims and allegations to determine whether a claim has been sufficiently stated to survive immediate dismissal.

In the present action, Plaintiffs Todd and Samantha Blackburn ("Blackburns") assert the following claims against Defendant BAC Home Loans Servicing, LP ("BAC") based on BAC's servicing of their mortgage: "intentional and negligent failure to exercise due care in servicing loan"; violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617; trespass; conversion; and breach of contract.[1]  *See* Pls.' Third Am. Compl., ECF No. 30 [hereinafter 3d Am. Compl.].  BAC filed a Motion to Dismiss (ECF No. 33) seeking dismissal of all claims except the Blackburns' claim for conversion.  For the following reasons, the Court dismisses the Blackburns' state law claims that are based on allegations that BAC made inaccurate reports to the credit bureaus, their claim for "intentional and negligent failure to exercise due care in servicing loan," and their RESPA claim asserted under 12 U.S.C. § 2605(k).  The Court declines to dismiss the Blackburns' remaining claims, including their trespass claim, breach of contract claim, and RESPA claim brought under 12 U.S.C. § 2605(e).

MOTION TO DISMISS STANDARD

When considering a 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in the plaintiff's

---

[1] The Blackburns initially brought claims for fraud and defamation, but have voluntarily withdrawn those claims.  Pls.' Am. Resp. in Opp'n to Def.'s Am. Mot. to Dismiss Counts I-V, VII & IX of Pls.' Third Am. Compl. & Incorporated Mem. of Law 1, ECF No. 36 [hereinafter Pls.' Am. Resp.].

complaint and limit its consideration to the pleadings and exhibits attached thereto. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Twombly*, 550 U.S. at 570). The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do[.]" *Id.* Although the complaint must contain factual allegations that "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims, *id.* at 556, "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable,'" *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly,* 550 U.S. at 556).

## FACTUAL ALLEGATIONS

Accepted as true, the alleged facts are as follows.[2]

---

[2] The following recitation of the facts is based on the Blackburns' allegations and reasonable inferences from those allegations. Therefore, it is necessarily slanted toward the Blackburns' position and does not represent an objective determination of the facts by the Court as a fact finder. Such determination would be inappropriate at this stage of the proceedings.

In March 2006, the Blackburns obtained a federally-regulated loan to purchase a home by executing a promissory note in the amount of $162,418.00 in favor of Taylor, Bean and Whitaker Mortgage Corporation ("TB&W") and conveying a security interest in their home to TB&W.  The promissory note required the Blackburns to pay regular monthly payments to TB&W.  Mr. Blackburn, an active duty soldier in the United States Army, "set up an allotment at the Finance Office at Ft. Benning to have his monthly mortgage payment automatically deducted from his U.S. Army paycheck and sent directly to TB&W."  3d Am. Compl. ¶ 10.  The Blackburns' payments to TB&W were timely and current, and no problems arose while TB&W serviced the loan.

Mr. Blackburn subsequently received a letter dated August 23, 2009 informing him that effective September 1, 2009, the Blackburns' loan was assigned to BAC for servicing.  3d Am. Compl. Ex. 1, Letter from BAC to T. Blackburn (Aug. 23, 2009) 1, ECF No. 30-1 at 2.  Due to the timing of the letter and the regularly scheduled allotments, the Blackburns did not have sufficient time to change their next monthly allotment from being paid to TB&W to BAC.  And this proverbial pebble eventually became the giant snowball that allegedly destroyed the Blackburns' dream.

Because the regularly scheduled September allotment had been sent to TB&W and not to BAC, BAC's system showed that the

Blackburns had not made their monthly payment.   BAC then sent Mr. Blackburn a letter on September 9, 2009 stating that the Blackburns were delinquent on their loan.   3d Am. Compl. Ex. 2, Letter from BAC to T. Blackburn (Sept. 9, 2009) 1, ECF No. 30-1 at 8.   Compounding the initial error, BAC continued to send delinquency letters to the Blackburns even though they had made their payment to BAC's predecessor in interest, TB&W.   In what Plaintiffs suggest was a super-charged aggressive collection effort, BAC spit out letters so regularly that the Blackburns sometimes received two letters on the same day.   On September 16, 2009, BAC began sending Mr. Blackburn "Notices of Intent to Accelerate" that threatened foreclosure.   *E.g.*, 3d Am. Compl. Ex. 3, Letter from BAC to T. Blackburn (Sept. 16, 2009), ECF No. 30-1 at 29.   BAC's loan statements consistently showed that the Blackburns were in default by two payments, even though the Blackburns had set up an allotment at the beginning of the loan that to their knowledge was deducting the monthly payments from Mr. Blackburns' pay each month.   *E.g.*, 3d Am. Compl. Ex. 4, 03/30/2011 Statement, ECF No. 30-1 at 58.

In September 2009, Mr. Blackburn checked his military allotments to obtain proof that his allotment was being paid to TB&W.   Mrs. Blackburn obtained a statement from Army Finance showing the trace numbers of the military allotments sent to TB&W in an effort to convince BAC that they were not in default

on their loan payments. *See* 3d Am. Compl. Ex. 5, Pay Inquiry, ECF No. 30-1 at 61 (listing trace numbers for July 31, 2009 and September 1, 2009 allotments).  On September 22, 2009, Mrs. Blackburn obtained additional documents from the Army showing Mr. Blackburn's military allotments for August and September 2009 were paid to TB&W.  In short, the Blackburns had proof that the allegedly unpaid monthly payments were deducted from Mr. Blackburn's pay and sent directly to TB&W, which is the entity from whom the Blackburns had obtained the loan and to whom the original promissory note indicated the payments should be made.

Mrs. Blackburn took this documentation to the BAC office in Columbus, Georgia and spoke with BAC employee Heather Smith. Heather Smith called Autry Gray with BAC and "was told to disregard notifications of being in default and that Bank of America would submit a payment request to TB&W which would take sixty to ninety days." 3d Am. Compl. ¶ 22.  BAC employees made similar notations of the same during this discussion.  3d Am. Compl. Ex. 7, Loan History, ECF No. 30-1 at 68.

On November 19, 2009, BAC responded to the documentation provided by Mrs. Blackburn to Heather Smith and Autry Gray. Instead of focusing on straightening out the allotment payments that had been made to TB&W which presumably should have gone to BAC, BAC provided a type of uniform response asking Mr. Blackburn to send "a copy of the cancelled check (front and

back) or a bank source receipt (you can obtain from your bank) if payment was made via Home banking along with a copy of your Bank Statements" as "required back-up" proof of payment.    3d Am. Compl. Ex. 8, Letter from BAC to T. Blackburn (Nov. 19, 2009), ECF No. 30-1 at 77.   Of course, with an allotment, there would be no cancelled check or credit on a bank statement.   BAC had failed to understand the nature of the problem, even though the Blackburns and the local BAC branch had informed BAC that the payments were paid by military allotment.   Continuing under a misunderstanding of the nature of the problem, BAC sent another letter on December 28, 2009, inexplicably requesting cancelled checks and bank statements.    3d Am. Compl. Ex. 9, Letter from BAC to T. Blackburn (Dec. 28, 2009), ECF No. 30-1 at 79.   Then, to add to the confusion, BAC sent another letter on the same day acknowledging receipt of correspondence from Mr. Blackburn and stating that BAC was "in the process of obtaining the documentation and information necessary to address [his] questions and concerns" and promising to "provide a more complete response within twenty (20) business days."   3d Am. Compl. Ex. 10, Letter from BAC to T. Blackburn (Dec. 28, 2009), ECF No. 30-1 at 81.

    For a year and a half, Mr. Blackburn made frustrated attempts to correct a misunderstanding that should have been easily remedied and arguably was not of his own making.   These

attempts included numerous telephone calls to BAC's toll free numbers. These conversations were unproductive and typically concluded with the BAC representative parroting the call center script: "When are you going to make the payments?".

Sometime after July 30, 2010, Mrs. Blackburn once again went to the Columbus, Georgia BAC office, taking with her copies of Mr. Blackburns' July 31, 2009 through July 31, 2010 earnings statements and spoke with employee Fabien Smith. Fabien Smith called BAC's research department. The research department told him that the problem would be "straightened out right away." 3d Am. Compl. ¶ 28. Fabien Smith and Mrs. Blackburn also faxed documentation to BAC regarding the loan. Following these efforts, Mr. Blackburn again made numerous phone calls to BAC, attempting to explain that his payments were all being made by military allotment.

In November 2010, Integrity Field Service employees came onto the Blackburns' property and took photographs of the property and home. The day before Thanksgiving that year, Mr. Blackburn confronted one of them who stated that he worked for Integrity Field Services. That agent gave Mr. Blackburn a business card stating his name as "Rayburn Wilson," a salesman for a Carl Gregory car dealership. 3d Am. Compl. Ex. 16, R. Wilson Business Card, ECF No. 30-1 at 108. But, the agent then wrote on the back of the card the name "Rodney Russell," a phone

number, and "Integrity Field Services."   3d Am. Compl. Ex. 17,
Back of Business Card, ECF No. 30-1 at 110.   Mr. Blackburn was
very concerned about this man snooping around his home and
taking photographs.   Integrity Field Service employees continued
to return to the property to take pictures and would place
pieces of paper in the crack of the Blackburns' front door.
*E.g.*, 3d Am. Compl. Ex. 18, Printed Note, ECF No. 30-1 at 112
(giving contact info to call "loan servicing" and stating "[a]n
independent property inspector visited your property today for
Bank Name: CHL.").

   BAC sent a letter dated February 10, 2011 acknowledging
receipt of Mr. Blackburn's "request regarding [his] payment sent
to the previous lender (Taylor Bean and Whitaker)."   3d Am.
Compl. Ex. 12, Letter from BAC to T. Blackburn (Feb. 10, 2011),
ECF No. 30-1 at 97.   The letter stated that BAC was unable to
respond to the inquiry without further information and again
requested a copy of Mr. Blackburn's cancelled check, which of
course did not exist.   The Blackburns continued to receive
letters threatening foreclosure through the date of the filing
of the Third Amended Complaint in this action.   *E.g.*, 3d Am.
Compl. Ex. 13, Letter from BAC to T. Blackburn (Mar. 1, 2011),
ECF No. 30-1 at 99.

   On March 9, 2011, Mrs. Blackburn emailed Fabien Smith at
BAC to check on the status of the loan.   3d Am. Compl. Ex. 14,

Email from S. Blackburn to F. Smith (Mar. 9, 2011), ECF No. 30-1 at 102. Fabien Smith responded that he had again informed the BAC researchers that no physical check would have been sent and that the payments were made by military allotment. He further stated that BAC was "assuring [him] this time it will get credited to the account," "this will not be reported and affect [Mr. Blackburn's] credit," he was "[s]orry for all of this," and he would keep her posted. 3d Am. Compl. Ex. 15, Email from F. Smith to S. Blackburn (Mar. 14, 2011), ECF No. 30-1 at 106. As of that date, at least two more Integrity Field Service employees had come onto the Blackburns' property and taken pictures of their home.

Mr. Blackburn was particularly sensitive about adverse credit information appearing on his credit report because it could negatively affect his Army career. BAC at all times assured the Blackburns that BAC would not report negative credit information on their credit reports. The Blackburns relied on these assurances and took no further action to see that BAC did not report a default status to the credit bureaus.

On March 31, 2011, Mr. Blackburn ordered copies of his credit reports and much to his dismay learned that BAC had reported him two months delinquent on his loan payments beginning in May 2010. The Blackburns maintain that these reports were false, that BAC knew they were false, that BAC

acted recklessly regarding the reporting of the false information, and that the reports damaged their credit reputation.

On November 29, 2011, Mr. Blackburn sent a letter to BAC at the address designated by BAC for receipt of "qualified written requests."  The letter included his name and identifying account information and stated the following:

> I have repeatedly requested that all fees and charges collected by you on my account be credited back to me.
>
> Again, I request that you do so immediately and inform me, _in writing_, what amounts have been credited to my account, what they were collected for in the first place, and why they were collected by you.

3d Am. Compl. Ex. 19, Letter from T. Blackburn to BAC (Nov. 29, 2011), ECF No. 30-1 at 114.  BAC acknowledged receipt of this letter by letter dated December 8, 2011 and promised a complete response within twenty business days.  3d Am. Compl. Ex. 20, Letter from BAC to T. Blackburn (Dec. 8, 2011), ECF No. 30-1 at 116; 3d Am. Compl. ¶¶ 63-65.  BAC then sent a letter stating that it had finished researching the issue of fees due on the account and that it is "unable to waive the fees in the amount of $15.66."  3d Am. Compl. Ex. 21, Letter from BAC to T. Blackburn (Dec. 14, 2011), ECF No. 30-1 at 118.  By this letter, BAC did not fully respond to the November 29, 2011 letter's requests and sent no further letters on the matter.  By calling

BAC, Mr. Blackburn eventually learned that BAC "had been taking property inspection fees from [his] payments for a number of months and that he still owed a balance." 3d Am. Compl. ¶ 69. In that conversation, the BAC representative promised to send something in writing detailing the fees due, but Mr. Blackburn never received anything to that effect. BAC did not make any further response or make appropriate corrections to the Blackburns' account.

In January and February 2012, BAC took portions of the Blackburns' monthly payments "for unauthorized and unexplained 'fees due' when [the Blackburns] did not owe those unauthorized fees" or any other fees. 3d Am. Compl. ¶ 53-H, I, & K. Further, on both the Blackburns' January and February 2012 statements, BAC incorrectly stated that it had received $1,062.62 from Mr. Blackburn, when it had received $1,070.00 from his military allotment. It had applied the difference to "unexplained 'fees due.'" *Id.* ¶ 53-J.

As a result of this whole ordeal, the Blackburns claim to have "suffered a great deal of mental stress . . . suffered emotionally, physically and financially . . . [and] expended time and money." 3d Am. Compl. ¶¶ 45-46.

DISCUSSION

BAC seeks dismissal of all of the Blackburns' claims except for their conversion claim.

12

**I.   Preemption of State Law Claims**

BAC first makes the blanket argument that to the extent that the Blackburns allege any state law claims arising from BAC's reporting of allegedly false information to credit reporting agencies, those claims are preempted by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681t(b)(1)(F).  The Blackburns respond that BAC's FCRA preemption arguments are now moot in light of their withdrawal of their claims for fraud and defamation based on BAC's reporting information to the credit bureaus.  In reply, BAC contends that the Blackburns continue to rely on allegations that BAC reported false information to credit bureaus in support of their remaining claims for damages, including "damages to credit reputation."  Further, BAC argues that § 1681t(b)(1)(F) of the FCRA preempts the Blackburns' claims and any damages to the extent that they are based on allegations that BAC reported false information to the credit bureaus.

The Blackburns claim that BAC violated Georgia common law because it "intentionally as well as negligently failed to exercise due care in servicing the Blackburns' loan" based on BAC's incorrect "reports to the credit bureaus."  3d Am. Compl. ¶¶ 50, 52.  They also allege that "[Mr. Blackburn's] credit reputation has been damaged by [BAC's] false reporting to the credit bureaus" and that BAC "acted with malice and with

knowledge that the information reported to the credit bureaus was false or with reckless disregard of whether it was false or not." *Id.* ¶¶ 43-44. The Blackburns continue to rely on these allegations: "The factual allegation remains, and Defendant does not deny, that it falsely reported Plaintiffs as delinquent to the credit agencies[.]" Pls.' Am. Resp. 2; *see also id*. at 7, 10 (stating that BAC assured the Blackburns that nothing would appear on their credit report and that BAC understood the importance of that issue). The point is not whether BAC reported false information to the credit bureaus. The issue is whether the Blackburns can maintain state law claims for that conduct or whether such claims are preempted by federal law. The Court finds that those claims are preempted.

Section 1681t(b)(1)(F) states: "No requirement or prohibition may be imposed under the laws of any State (1) with respect to any subject matter regulated under . . . (F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . ." Section 1681s-2 enumerates the responsibilities of furnishers of information to consumer reporting agencies, including the "[d]uty of furnishers of information to provide accurate information" and the "[d]uty to correct and update information." 15 U.S.C. § 1681s-2(a)(1)-(2).

The Blackburns' claims based on allegations that BAC reported inaccurate credit information to credit bureaus clearly arise from conduct regulated by § 1681s-2. Therefore, any claims based on these allegations are directly preempted by the plain language of the FCRA, 15 U.S.C. § 1681t(b)(1)(F). *See Ross v. FDIC*, 625 F.3d 808, 813 (4th Cir. 2010) (holding similar claims under North Carolina law "squarely preempted by the plain language of the FCRA").

Relying on opinions from various district courts, the Blackburns argue that § 1681t(b)(1)(F) only preempts state *statutory* claims and not state *common law* claims like those they have asserted. It appears that the Eleventh Circuit Court of Appeals has not yet weighed in on this issue. Two circuit courts of appeal have addressed the issue and have reached a conclusion contrary to the position asserted by the Blackburns. The Court finds these circuit court opinions persuasive.

The Second and Seventh Circuits have rejected a statutory-common law distinction and have held that § 1681t(b)(1)(F) applies equally to preempt state statutory and common law claims. *See Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 106-07 (2d Cir. 2009) (per curiam) (stating that "[p]laintiff's distinction between statutory and common-law claims under this section of the FCRA's express preemption provision is . . . unpersuasive" and holding that the word

15

"laws" in § 1681t(b) encompasses state statutory and common law claims); *Purcell v. Bank of Am.*, 659 F.3d 622, 623-24 (7th Cir. 2011) (applying the conclusion of *Premium Mortgage* to § 1681t(b)(1)(F) to reverse the district court's finding that plaintiff's state law claims were not preempted); *Macpherson v. JPMorgan Chase Bank, N.A.*, 665 F.3d 45, 47-48 (2d Cir. 2011) (per curiam) (stating that § 1681t(b)(1)(F) is not limited to preempting only statutory claims and holding that § 1681t(b)(1)(F) preempted plaintiff's common law claims for defamation and intentional infliction of emotional distress based on allegations that the bank willfully provided false credit information to a credit reporting agency). At least one other district court in this Circuit has reached a similar conclusion. *See Spencer v. Nat'l City Mortg.*, 831 F. Supp. 2d 1353, 1362-63 (N.D. Ga. 2011) (holding that "preemption under § 1681t(b)(1)(F) extends not only to state statutory claims, but to state common-law claims as well."). The Court finds that § 1681t(b)(1)(F) preempts the Blackburns' Georgia common law claims for damages based on allegations of BAC's inaccurate reporting to credit bureaus, including intentional and negligent servicing and harm to credit reputation.

16

**II.   Remaining State Law Claims**

   A.   Intentional and Negligent Failure to Exercise Due Care
        in Servicing Loan

   The Blackburns allege that BAC "intentionally ignored the
Blackburns' notice to [BAC] that they were not and had never
missed making a mortgage payment," that "[d]espite being put on
notice that [BAC's] information concerning the status of
Plaintiff's loan was incorrect, [BAC] continued to harass the
Plaintiffs with letters, [and] threats," and that BAC's conduct
in servicing the Blackburns' loan amounted to negligence.   3d
Am. Compl. ¶¶ 50-52.

   BAC seeks dismissal of these claims.   It argues that the
only duties it owed to the Blackburns regarding the servicing of
their loan were contractual, and under Georgia law, the failure
to perform a contract is not a tort.   In Georgia, "[a]
defendant's mere negligent performance of a contractual duty
does not create a tort cause of action; rather, a defendant's
breach of a contract may give rise to a tort cause of action
only if the defendant has also breached an independent duty
created by statute or common law."   *Fielbon Dev. Co. v. Colony
Bank of Houston Cnty.*, 290 Ga. App. 847, 855, 660 S.E.2d 801,
808 (2008) (alteration in original).   The duties BAC owed to the
Blackburns in the servicing of their loan are the duties that
the parties agreed to in their contract, or, in this case, the

duties agreed to between the Blackburns and TB&W, which were assumed by BAC upon the assignment of the loan for servicing. The Blackburns point to no independent duty, but they simply suggest that the negligent performance of a contractual duty gives rise to a tort, which is inconsistent with well-established Georgia law. *See id.* at 856, 660 S.E.2d at 808-09 (holding that a bank whose duties all arose out of its administration of a loan was not subject to suit in tort based on those grounds).  To the extent that the Blackburns allege such a claim, it must be dismissed.

### B.   Trespass

The Blackburns also allege that BAC committed the tort of trespass when it sent agents onto their property to take photographs and leave notes in their front door.  BAC seeks dismissal of the Blackburns' trespass claim, asserting that the claim fails because under the terms of the Blackburns' mortgage BAC had permission to do what it did.  Although under Georgia law, any unlawful interference with another's right of enjoyment of his private property is a trespass, O.C.G.A. § 51-9-1, consent effectuated by contract may modify this property right, *Tacon v. Equity One, Inc.*, 280 Ga. App. 183, 188, 633 S.E.2d 599, 604 (2006).

As evidence of the Blackburns' consent for BAC's entry on their property, BAC cites to paragraph 7 of the Mortgage which states in pertinent part:

> Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

3d Am. Compl. Ex. 34, Mortgage ¶ 7, ECF No. 30-1 at 169. BAC construes this paragraph as "expressly permit[ting] entry onto their property for any reason" and requiring "reasonable cause" only for interior and not exterior inspections. Def.'s Am. Mot. to Dismiss 25, ECF No. 33. This interpretation ignores the general requirement that all entries and inspections must be "reasonable." Mortgage ¶ 7. The Blackburns allege that the inspections were not reasonable because they timely paid their mortgage by military allotment, they worked to correct BAC's assertion of default and assessment of fees, they objected to BAC's repeated entry on their property, and yet, BAC's agents continued to repeatedly enter onto the property and take pictures, sometimes surreptitiously by hiding their identity with a fake business card and sometimes aggressively through a physical confrontation with Mr. Blackburn. The Court finds that these allegations sufficiently state a claim for trespass under Georgia law.

C.   Breach of Contract

The Blackburns also allege a state law claim for breach of contract.  They allege that BAC breached the terms of the note and security deed.  BAC contends that the Blackburns have not adequately pleaded a breach of contract claim because the Blackburns have not alleged the existence of a contract between them and BAC.  It maintains that the note and security deed were executed between the Blackburns and TB&W, not BAC.  BAC argues that it is merely the servicer of the loan.  BAC further contends that even if the Blackburns alleged a contract between the parties, the Blackburns failed to identify which provisions of the note and security deed (mortgage) BAC allegedly breached.

To establish a claim for breach of contract under Georgia law, a plaintiff must first plead the existence of a valid contract.  *Eastview Healthcare, LLC v. Synertx, Inc.*, 296 Ga. App. 393, 398-99, 674 S.E.2d 641, 646 (2009).  After establishing the existence of a contract, the plaintiff must also present evidence that defendant breached that contract. *Id.* at 399, 674 S.E.2d at 646.

The Court interprets the Complaint to allege the Blackburns executed a note and security deed and that loan was assigned to BAC for servicing.[3]  The Blackburns allege that BAC then failed

---

[3] The Court observes that if discovery establishes that there was no assignment, then the Blackburns may have a tort claim against BAC for negligent servicing of the loan.  The Court dismissed that claim above

to properly credit payments to their account that were being made by military allotment. 3d Am. Compl. ¶¶ 15-17. They allege BAC took fees from their monthly payments that they did not owe and refused to credit or return those fees. *Id.* ¶¶ 53, 58, 60-62, 69-92. Further, they allege that despite being current on their loan payments and their efforts to correct the inaccurate default status of their loan, BAC sent monthly letters threatening foreclosure. *Id.* ¶ 31. Additionally, they allege that BAC sent inspectors onto their property and made unreasonable inspections. *Id.* ¶¶ 34-38.

Consistent with the requirements of notice pleading, the Blackburns succinctly allege that BAC breached the provisions of the note and security deed regarding (1) application of payments, (2) permissible fees and charges, (3) notices, and (4) property inspections. The Court therefore concludes that the Third Amended Complaint contains "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Therefore, the Court denies BAC's motion to dismiss the Blackburns' breach of contract claim.

---

because it concluded that the Blackburns have alleged the assignment of the loan to BAC and that the duties owed to the Blackburns were contractual and not in tort. But, if it turns out that no such contractual duty exists, then there would no longer be this impediment to the Blackburns' tort claim, and the Court would likely reconsider its ruling on that issue.

## III. RESPA Claims

The Blackburns allege that BAC failed to comply with the provisions of RESPA that require a loan servicer to respond to borrowers' inquiries and exercise due care in servicing loans. The Blackburns assert RESPA claims under 12 U.S.C. § 2605(e) and § 2605(k).  3d Am. Compl. ¶ 53-D & M-N.

### A.    RESPA Claim Under § 2605(e)

If a borrower sends her mortgage servicer a "qualified written request" seeking account corrections or account information, the servicer must acknowledge receipt of the request and respond to the request by correcting the account or conducting an investigation and providing the borrower with a written explanation of why the servicer believes the account is correct.  12 U.S.C. § 2605(e)(1)-(2).  If a servicer fails to comply with RESPA, the borrower may recover "any actual damages to the borrower as a result of the failure."  12 U.S.C. § 2605(f)(1)(A).

The Blackburns base their RESPA claim on a letter they sent to BAC dated November 29, 2011.  Letter from T. Blackburn to BAC (Nov. 29, 2011), ECF No. 30-1 at 114.  BAC argues that the letter does not qualify as a "qualified written request."  That argument is unpersuasive.  Under RESPA, a "qualified written request" is:

> a written correspondence [that] . . . enables the
> servicer to identify, the name and account of the
> borrower; and . . . includes a statement of the
> reasons for the belief of the borrower, to the extent
> applicable, that the account is in error or provides
> sufficient detail to the servicer regarding other
> information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B). The November 29, 2011 letter identified the borrowers by name and account number, was sent to BAC's exclusive office and address for qualified written requests as required by 24 C.F.R. § 3500.21(e)(1), listed the borrowers' concerns with fees and charges improperly collected by BAC and not credited to the account, and requested information regarding the account, specifically "what amounts have been credited to [the] account, what they were collected for in the first place, and why they were collected by [BAC]." Letter from T. Blackburn to BAC (Nov. 29, 2011), ECF No. 30-1 at 114. The Court finds that this letter meets the requirements for a "qualified written request" under § 2605(e)(1)(B).[4]

BAC also contends that the Blackburns do not state a claim under § 2605(e) because the letter they rely on as their qualified written request was sent to BAC on November 29, 2011, more than six months after the Blackburns filed their initial Complaint in this action on April 15, 2011. Compl., ECF No. 1. BAC ignores the fact that after sending the letter, the

---

[4] BAC also requests that any RESPA claims based on letters other than the November 29, 2011 letter be dismissed. Def.'s Am. Mot. to Dismiss 23. The Court, however, finds that the Blackburns have asserted no other bases for their RESPA claims. *See* 3d Am. Compl. ¶ 53.

Blackburns amended their Complaint on February 27, 2012 to allege a RESPA § 2605(e) claim based on the November 29, 2011 qualified written request. 3d Am. Compl. The Court finds no legal basis for dismissing the claim merely because the letter on which it relies was sent while other claims were pending in this action.

It is also clear that the Blackburns have sufficiently stated a claim for noncompliance with § 2605(e)(2) of RESPA because BAC failed to properly respond to the Blackburns' qualified written request, take appropriate responsive action, or undertake an investigation into the issues raised by the letter. A loan servicer must "acknowledge[e] receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays)" and provide the borrower with a written explanation or clarification responsive to the qualified written request within "60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt" of the qualified written request. § 2605(e)(1)(A), (e)(2). BAC did acknowledge receipt of the November 29, 2011 letter. Letter from BAC to T. Blackburn (Dec. 28, 2009), ECF No. 30-1 at 81. But, BAC then sent a letter stating that it had finished researching the issue of fees due on the account and that it is "unable to waive the fees in the amount of $15.66." Letter from BAC to T. Blackburn (Dec. 14, 2011), ECF No. 30-1 at 118. This response failed to

fully respond to the November 29, 2011 letter's requests.  The Blackburns allege that they received no further response from BAC.  Moreover, BAC does not assert that it complied with the response requirements of § 2605(e)(2) after receiving the Blackburns' November 29, 2011 qualified written request.  The remaining arguments made by BAC for dismissal of the Blackburns' § 2605(e) claim simply ignore the Third Amended Complaint and are unpersuasive.

The Blackburns have stated a RESPA claim under § 2605(e), and thus BAC's motion to dismiss that claim is denied.

### B.   RESPA Claim Under § 2605(k)

The Blackburns also attempt to assert a claim under 12 U.S.C. § 2605(k).  As this Court recognized in *Bates v. JPMorgan Chase Bank, N.A.,* RESPA § 2605(k) is not yet in effect.  *See Bates v. JPMorgan Chase Bank, N.A.*, No. 4:12-CV-43 (CDL), 2012 WL 3727534, at *4 (M.D. Ga. Aug. 27, 2012).  Accordingly, the Blackburns cannot base a RESPA claim on § 2605(k), and thus their RESPA claim under § 2605(k) is dismissed.

CONCLUSION

For the reasons set forth above, the Court grants BAC's Motion to Dismiss (ECF No. 33) as to the Blackburns' state law claims that are based on BAC's reporting of inaccurate information to credit bureaus, their intentional and negligent failure to service loan claims, and their RESPA claim under 12

25

U.S.C. § 2605(k).   The following claims remain pending: (1) trespass claim; (2) breach of contract claim; (3) RESPA claim pursuant to 12 U.S.C. § 2605(e); and (4) conversion claim.

The Court notes that BAC has filed a Motion for Summary Judgment as to all of the Blackburns' claims.   The Court will decide that motion when it becomes ripe.

IT IS SO ORDERED, this 13th day of September, 2012.

S/Clay D. Land
_____
CLAY D. LAND
UNITED STATES DISTRICT JUDGE