IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

TODD BLACKBURN and SAMANTHA *
BLACKBURN,
                                    *
     Plaintiffs,
                                    *
vs.                                     CASE NO. 4:11-CV-39 (CDL)
                                    *
BAC HOME LOANS SERVICING, LP,
                                    *
     Defendant.
                                    *
_____

O R D E R

Defendant BAC Home Loans Servicing, LP ("BAC") admits that it made a mistake which it eventually corrected.  For its confession and atonement, it seeks absolution.  Plaintiffs Todd and Samantha Blackburn ("Blackburns"), having allegedly "gone through hell" for what they argue was more than just a simple mistake, are in no mood for mercy.  They seek compensation and retribution.

BAC failed to recognize that the Blackburns paid their mortgage through automatic deduction and allotment from Todd Blackburn's military paycheck, and consequently, did not give the Blackburns credit for their August and September 2009 mortgage payments.  Eventually acknowledging its mistake, BAC credited the payments by April 2011 before the Blackburns filed this action.  By May 2012, the Blackburns' account was completely corrected with all unauthorized fees and charges

having been credited to the account.   Nevertheless, the Blackburns assert claims for violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e), trespass, conversion, and breach of contract.   BAC seeks summary judgment as to these claims.   For the following reasons, the Court denies BAC's Motion for Summary Judgment (ECF No. 61) as to the Blackburns' RESPA claim, trespass claim, and conversion claim.   Because emotional distress and punitive damages are not recoverable for a breach of contract, the Court grants BAC's Motion for Summary Judgment as to those claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   A fact is *material* if it is relevant or necessary to the outcome of the suit.   *Id.* at 248.   A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.   *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to the Blackburns, the evidence is as follows. Unless otherwise noted, the facts are undisputed for purposes of summary judgment.

## I.   The Blackburns' Mortgage

In March 2006, the Blackburns obtained a loan to purchase a home by executing a promissory note in the amount of $162,418.00 in favor of Taylor, Bean and Whitaker Mortgage Corporation ("TB&W") and conveying a security interest in their home to TB&W.   T. Blackburn Dep. Ex. A-1, Mortgage, ECF No. 58-2; T. Blackburn Dep. Ex. A-2, Note, ECF No. 58-3.   Mr. Blackburn, an active duty member of the United States Army, paid the mortgage to TB&W through military allotment payments.   T. Blackburn Dep. 21:5-6, ECF No. 58.   The Blackburns had no payment issues while TB&W held the mortgage.

## II. Loan Assigned to BAC

In August 2009, because of TB&W's default and bankruptcy, BAC was ultimately assigned the Blackburns' loan as part of a servicing contract covering approximately 180,000 loans.   Wagner Aff. ¶¶ 6-7, ECF No. 61-2.[1]   The Blackburns were informed by a

---

[1] The Blackburns assert that Caren Wagner's affidavit constitutes hearsay and as such cannot be considered in support of BAC's motion for summary judgment.   Wagner avers under oath that she has personal knowledge of the facts and the business records she details in her affidavit.   Wagner Aff. ¶ 4.   The Court finds that the information relied on by the Court from Wagner's affidavit should not be excluded as hearsay for purposes of deciding BAC's summary judgment motion.

letter dated August 23, 2009 that effective September 1, 2009 their loan was assigned to BAC. T. Blackburn Dep. Ex. A-5, Letter from BAC to T. Blackburn (Aug. 23, 2009), ECF No. 58-6. By the time they received this transfer letter, the Blackburns' August 2009 military allotment had previously been sent to TB&W. S. Blackburn Dep. 23:24-24:2, ECF No. 59. Although they tried to change their September 2009 allotment, the Blackburns did not have sufficient time to redirect that allotment from TB&W to BAC. As a result, it was erroneously sent to TB&W instead of BAC. *Id.* at 23:4-24:7; *see also* T. Blackburn Dep. 51:20-53:2 (explaining that the 21st of each month is the cut-off for changing an allotment and that the letter was received after that cut-off). The allotment was finally changed so that it was paid to BAC effective October 2009. S. Blackburn Dep. 24:8-24.

Because of actions taken by TB&W before BAC assumed its loans, certain customer payments were frozen by the Federal Deposit Insurance Corporation. Wagner Aff. ¶ 9. Therefore, the Blackburns' payments for August and September 2009, which had been sent to TB&W before the change in the allotment was made to BAC, were not credited to their loan account. As a result, "when [BAC] began servicing [the Blackburns'] loan, its records indicated that [the Blackburns] were delinquent on their payments." *Id.* ¶ 10. Operating under the belief that the

Blackburns were delinquent on their August and September 2009 payments, BAC engaged in the following actions. *Id.* ¶¶ 8, 10.

On September 9, 2009, BAC began sending notices to Mr. Blackburn that he was delinquent on his loan. Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. A, S. Blackburn Aff. ¶ 3, ECF No. 64-1; Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. B, T. Blackburn Aff. ¶ 4, ECF No. 64-2; *see, e.g.*, T. Blackburn Dep. Ex. A-6, Letter from BAC to T. Blackburn (Sept. 9, 2009) 1, ECF No. 58-7 (stating total amount due to bring the loan current is $2,057.80, the amount of the August and September 2009 payments). A few days later on September 16, 2009, BAC began sending "Notice[s] of Intent to Accelerate" and threatening foreclosure. T. Blackburn Dep. Ex. A-7, Notices from BAC to T. Blackburn, ECF No. 58-8. The Blackburns received multiple notices, often several in the same day. *Id.*; S. Blackburn Dep. 41:6-24. Starting in September 2009, each of the notices and the Blackburns' monthly mortgage statements reflected BAC's contention at the time that the Blackburns had not paid their August and September 2009 mortgage payments. T. Blackburn Dep. 47:9-48:17.

In addition to the typical stress associated with having a home loan erroneously declared delinquent, Mr. Blackburn contends that the stress was heightened for him because it could threaten his military career. As an Army Ranger, he was

required to avoid any financial difficulties that could jeopardize his security clearance. S. Blackburn Dep. 51:3-11. The Blackburns therefore vigorously attempted to convince BAC that they were not delinquent on their loan and had in fact paid the August and September 2009 mortgage payments—albeit to Colonial Bank, the acting servicer when TB&W held the loan. The Blackburns repeatedly called BAC's 1-800 numbers hoping for a resolution. Mrs. Blackburn obtained a statement from Army Finance showing the trace numbers for the August and September 2009 military allotments, the allotments, and the recipient of the allotments. S. Blackburn Dep. 34:1-25, 54:23-57:23. In September 2009, Mrs. Blackburn took the information to the local BAC branch office in Columbus, Georgia. S. Blackburn Dep. 29:24-30:10, 31:2-5. At the office, BAC employee Autry Gray instructed the Blackburns to disregard the notices and stated that a payment request would be submitted to TB&W and could take sixty to ninety days. *Id.* at 34:7-13, 40:17-41:2. It appeared that the BAC employee at the Columbus office fully understood the problem and proceeded to fix it.

Unfortunately, something got lost in the translation between Columbus and BAC's processing center. In response to the documents that Mrs. Blackburn took to the BAC office, BAC sent a letter stating, "We have received the proof of your missing payment which was remitted to [TB&W]. However, the

documents you have provided us with is [sic] not sufficient." T. Blackburn Dep. Ex. A-9, Letter from BAC to T. Blackburn (Nov. 19, 2009), ECF No. 58-9. Failing to comprehend that the Blackburns made their payments by military allotment, the BAC letter requested Mr. Blackburn to send "a copy of the cancelled check (front and back) or a bank source receipt (you can obtain from your bank) if payment was made via Home banking along with a copy of your Bank Statements" as "required back-up" proof of payment. *Id.* BAC subsequently sent another letter requesting the same information. T. Blackburn Dep. Ex. A-10, Letter from BAC to T. Blackburn (Dec. 28, 2009), ECF No. 58-10. BAC made these requests despite being informed that the Blackburns paid their mortgage by military allotment and thus such documents did not exist. S. Blackburn Aff. ¶¶ 11-13; T. Blackburn Aff. ¶¶ 11-14.

Inexplicably, the problem with the Blackburns' account remained unresolved for the next year and a half. During that time, BAC continued sending letters to the Blackburns threatening foreclosure and stating they were in default. S. Blackburn Aff. ¶ 3; T. Blackburn Aff. ¶ 4. Mrs. Blackburn returned to the local BAC office several times to meet with employee Fabien Smith ("Smith") to try to resolve the situation. S. Blackburn Dep. 49:22-50:10.

To compound the problem, BAC began sending inspectors onto the Blackburns' property in approximately February 2010 to examine the integrity of the loan collateral.  Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. C, Inspection Form (Feb. 8, 2010), ECF No. 64-3 at 2.  The Blackburns first saw an inspector on their property the day before Thanksgiving in 2010. S. Blackburn Dep. 76:12-21; T. Blackburn Dep. 134:22-135:7; Inspection Form (Nov. 23, 2010), ECF No. 64-3 at 22.  The inspector did not enter the house.  T. Blackburn Dep. 139:14-25. When Mr. Blackburn confronted the inspector, he gave Mr. Blackburn a business card for a Carl Gregory car dealership salesman named "Rayburn Wilson."  *Id.* at 136:8-13, 138:3-11. The inspector wrote on the back of the card a different name, a phone number, and "Integrity Field Services."  *Id.* at 138:5-25. Eventually the inspector stated that he was "hired by a company . . . to take pictures and do inspections."  *Id.* at 135:8-136:18, 138:3-7.  Mr. Blackburn was very concerned about this man snooping around his home and taking photographs.  *Id.* at 139:5-10.  Inspectors continued to return to the property and take pictures, peer in the windows, and place pieces of paper in the crack of the Blackburns' front door.  S. Blackburn Dep. 78:1-81:15.  These inspections continued until at least March 2011.  Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. C, Inspection Form (Mar. 19, 2011), ECF No. 64-3 at 30.

In February 2011, in response to the Blackburns' persistent inquiries, BAC sent another letter stating that they could not "research the payment made to [TB&W] as [they] do not have sufficient information." T. Blackburn Dep. Ex. A-12, Letter from BAC to T. Blackburn (Feb. 10, 2011), ECF No. 58-12. The letter again requested a cancelled check, a bank source receipt, or a signed letter of receipt. *Id.*

On March 9, 2011, Mrs. Blackburn emailed Smith, restating her concerns about Mr. Blackburn's credit report and expressing her frustration with BAC's requests for cancelled checks and information supporting the payments to TB&W that simply did not exist because the payments were made by military allotment. T. Blackburn Dep. Ex. A-14, Email from S. Blackburn to F. Smith (Mar. 9, 2011), ECF No. 58-14. Smith replied to Mrs. Blackburn stating that the Blackburns' account would be credited and the missing payments would not get reported or affect Mr. Blackburn's credit. S. Blackburn Dep. 68:17-69:25 & Ex. I, Email from F. Smith to S. Blackburn (Mar. 14, 2011), ECF No. 59-10.

Throughout this ordeal, the Blackburns made sure that BAC was aware of the seriousness of any negative entries on Mr. Blackburn's credit report because of his government security clearance. T. Blackburn Dep. 106:15-24, 109:12-111:1 & Ex. A-14, Email from S. Blackburn to F. Smith (Mar. 9, 2011), ECF No.

58-14.   BAC repeatedly assured the Blackburns that nothing negative regarding their mortgage would appear on Mr. Blackburn's credit report.   T. Blackburn Dep. 66:6-15, 97:7-98:11; *see also* Email from F. Smith to S. Blackburn (Mar. 14, 2011) ("I explained to [the BAC researchers] about Mr. B's clearance and how this could affect it, he assured me that this will not be reported and affect his credit.").   Nonetheless, when Mr. Blackburn ordered his credit reports on March 31, 2011, he learned that BAC had reported that he had been two months delinquent on his mortgage since April 2010.   T. Blackburn Dep. 152:23-153:11 & Ex. A-22, Equifax Credit Report (Mar. 31, 2011), ECF No. 58-19 at 2-3 (stating the past due balance on BAC mortgage as $2,124, the date reported as February 2011, and the "Date of First Delinquency" as April 2010).

## III. BAC's Actions to Remedy the Blackburns' Account

Once it took over the TB&W loans, BAC engaged in a process to determine which TB&W borrowers were actually in default. Wagner Aff. ¶¶ 12-13.[2]   BAC admits that the documentation available for military allotments was different, and that it should have had a different process in place for identifying

---

[2] In attempts to "deny" many of the facts put forth by BAC, the Blackburns challenge the efficacy of BAC's process for examining the approximately 180,000 loans it took over from TB&W.   These statements do not dispute the facts asserted by BAC, and the Blackburns point to no evidence disputing the facts about BAC's process.   Thus, the facts as to BAC's process to resolve the issues of TB&W loan defaults are undisputed.

those accounts.  Def.'s Resp. to Pls.' Mot. to Compel Ex. A, Wagner Dep. 55:7-17, ECF No. 46-1.[3]  On July 30, 2010, BAC finally received reconciliation data that it began parsing through to confirm the accurate status of the accounts.  Wagner Aff. ¶ 14.

On March 15, 2011, although BAC never received the funds for the Blackburns' missing August and September 2009 payments, it was finally able to confirm that the payments had been made to TB&W.  *Id.* ¶¶ 15-16.  BAC advanced its own funds and credited the payments to the Blackburns' account on April 4, 2011.  *Id.* That same day, BAC also refunded all late fees paid by the Blackburns in the amount of $342.00, issued retractions of the negative credit reporting, and stopped further property inspections.  *Id.* ¶ 17.  On April 15, 2011, the Blackburns filed their first Complaint.  Compl., ECF No. 1.

As of November 11, 2011, the report of default no longer appeared on Mr. Blackburn's credit report.  T. Blackburn Dep. 112:22-24, 160:13-161:15 (agreeing that at the time of his deposition on May 14, 2012 his credit and payments have been fixed).  "Due to a ministerial oversight, however, $75.00 in inspection fees remained on Plaintiffs['] account (this amount

---

[3] Caren Wagner's 30(b)(6) deposition is also filed at ECF No. 53, but that filing contains only the odd numbered pages, so the Court cites to the full copy of the deposition filed at ECF No. 46-1.

later appeared as $82.38 in inspections fees due to an internal accounting error)." Wagner Aff. ¶ 17.

To address certain remaining "fees due," on November 29, 2011, Mr. Blackburn sent a letter to BAC at the address designated by BAC for receipt of "qualified written requests." T. Blackburn Aff. Ex. A, Letter from T. Blackburn to BAC (Nov. 29, 2011), ECF No. 64-2 at 10. The letter included his name and identifying account information and stated the following:

> I have repeatedly requested that all fees and charges collected by you on my account be credited back to me.
>
> Again, I request that you do so immediately and inform me, in writing, what amounts have been credited to my account, what they were collected for in the first place, and why they were collected by you.

Id. BAC acknowledged receipt of this letter by a letter dated December 8, 2011 and promised a complete response within twenty business days. T. Blackburn Aff. Ex. B, Letter from BAC to T. Blackburn (Dec. 8, 2011), ECF No. 64-2 at 11. BAC then sent a letter stating that it had finished researching the issue of fees due on the account and that it was "unable to waive the fees in the amount of $15.66." T. Blackburn Aff. Ex. C, Letter from BAC to T. Blackburn (Dec. 14, 2011), ECF No. 64-2 at 12. By this letter, BAC did not fully respond to the November 29, 2011 letter's requests, sent no further letters on the matter, and took no responsive action. T. Blackburn Aff. ¶¶ 28-29.

Even after the November 2011 letter, BAC "collected late fees" from the Blackburns' mortgage payments through March 2012. Wagner Dep. 101:1-14. BAC sent statements to the Blackburns, stating they owed various amounts in "fees due," but did not explain what that meant or the basis for the fees. *See* Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. E, 12/01/2011 Statement 2, ECF No. 64-5 at 18-19 ($15.66 "Fees due"); Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. Ex. E, 01/03/2012 Statement 2, ECF No. 64-5 at 20-21 ($8.28 "Fees due"). Even though the Blackburns pay $1,070.00 per month per military allotment, BAC reflected on various statements that it had received less than that amount. S. Blackburn Aff. ¶ 7; T. Blackburn Aff. ¶ 8; 12/01/2011 Statement 2 (stating last payment as $1,062.62); 01/03/2012 Statement 2 (stating last payment as $1,062.62.). The Blackburns never voluntarily paid any late fees or fees due. S. Blackburn Aff. ¶ 8.

At the time it collected fees, BAC alleges that it relied on TB&W's data showing missing payments. But, BAC "know[s] now that Mr. Blackburn wasn't late on his account." Wagner Dep. 101:2-10. BAC admits that "it was an oversight, that those fees should have been credited . . . waived and credited or credited back for any amounts that had been previously paid for out of Mr. and Mrs. Blackburn's [monthly payments]." *Id.* at 131:1-5.

BAC corrected all fees, including the inspection fees, on May 23, 2012.  Mosesson Aff. ¶¶ 26-27, ECF No. 61-7.[4]

DISCUSSION

At this time, the Blackburns do not appear to have any out of pocket monetary damages.  Their account has finally been corrected, and they have been credited with all fees and charges that were erroneously made.  The thrust of their present complaint is that as a result of BAC's RESPA violations, trespass, conversion, and breach of contract, they have suffered severe emotional distress.  BAC seeks summary judgment as to each of these claims.

## I.   RESPA § 2605(e)

If a borrower sends her mortgage servicer a "qualified written request" seeking account corrections or account information, the servicer must acknowledge receipt of the request and respond to the request by correcting the account or conducting an investigation and providing the borrower with a written explanation of why the servicer believes the account is correct.  12 U.S.C. § 2605(e)(1)-(2).  The Blackburns allege that BAC violated this provision of RESPA when it failed to adequately respond to their letter dated November 29, 2011.

---

[4] The Blackburns "deny" that all fees have been credited to their account, but fail to point the Court to any evidence that there are outstanding fees due to be credited.  The Court thus accepts it as an undisputed fact that all payments and fees have been credited to the Blackburns' account as of May 23, 2012.  *Id.*

Letter from T. Blackburn to BAC (Nov. 29, 2011), ECF No. 64-2 at 10.

BAC does not deny that this letter was a qualified written request under RESPA or argue that its response to it satisfied its RESPA obligations as a matter of law.  Instead, BAC argues that it is entitled to summary judgment on this claim because the Blackburns have failed to point to any evidence of damages suffered as a result of the alleged RESPA violation that are recoverable under RESPA.[5]  Def.'s Reply in Supp. of Mot. for Summ. J. 13-14, ECF No. 70.  It is undisputed that, as of May 2012, the fees inquired about in the November 29, 2011 letter have been credited, and the Blackburns have pointed to no evidence of pecuniary harm.  Their RESPA claim for damages rests entirely upon their contention that the RESPA violation caused them severe emotional distress.

If a servicer fails to comply with RESPA, the borrower may recover "any actual damages to the borrower as a result of the failure."  12 U.S.C. § 2605(f)(1)(A).  Although RESPA does not define "actual damages," the Eleventh Circuit has explained that as "in other consumer-protection statutes that are remedial in nature, plaintiffs arguably may recover for non-pecuniary

_____

[5] BAC also requests summary judgment on any RESPA claims based on letters other than the November 29, 2011 letter.  Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 31, ECF No. 61-1 [hereinafter Def.'s Mem.].  The Court, however, finds that the Blackburns have asserted no other bases for their RESPA claims.

damages, such as emotional distress and pain and suffering, under RESPA." *McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010) (per curiam); *accord James v. Litton Loan Servicing, L.P.*, No. 4:09-CV-147 (CDL), 2011 WL 59737, at *8, *10 (M.D. Ga. Jan. 4, 2011). The Blackburns present unrebutted evidence that BAC's actions caused them fear, embarrassment, unease, great frustration, and "a lot of stress on [the Blackburn] family" and their marriage. T. Blackburn Dep. 108:10-25, 151:23-152:17, 158:17-159:1, 160:21-161:21, 171:5-173:10; S. Blackburn Dep. 41:6-42:8, 64:18-65:16, 91:18-92:6. Mr. Blackburn suffered "frustration and anger and sleepless nights." T. Blackburn Dep. 176:6-16. Mrs. Blackburn experienced "[h]eadaches, sleepless nights, . . . weight gain from the depression[,] weight loss from not having much of an appetite[, and t]he stress of fighting with [her] husband." S. Blackburn Dep. 104:1-10. Some of this stress, according to the Blackburns, was attributable to BAC's continued failure to adequately address their problem, including BAC's inadequate response to their letter which is the basis for the RESPA violation. From this evidence, the Court concludes that a genuine fact dispute exists as to whether the Blackburns suffered actual damages as a result of BAC's alleged RESPA

violation.[6]  The Court, therefore, denies BAC's summary judgment motion as to the RESPA § 2605(e) claim.[7]

It appears that in their response to BAC's motion for summary judgment, the Blackburns seek to add a new claim under RESPA, 12 U.S.C. § 2605(d).  Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. 28.  BAC seeks summary judgment on this claim. Def.'s Reply in Supp. of Mot. for Summ. J. 14, ECF No. 70.  The Blackburns failed to properly amend their Third Amended Complaint, ECF No. 30, to add this claim.  Accordingly, this claim is not properly before the Court and will not be considered in this action.

## II. Trespass

BAC seeks summary judgment on the Blackburns' trespass claim, contending the parties' mortgage agreement bars the claim.  BAC further argues that even if the mortgage does not bar the trespass claim, the claim is one for breach of contract rather than the tort of trespass, and therefore, emotional distress damages are not recoverable.

---

[6] Of course, at trial, Plaintiffs may only recover emotional distress damages on their RESPA claim that were proximately caused by the alleged RESPA violation and not for emotional distress preceding or unrelated to the RESPA violation.

[7] In its motion, BAC primarily argues that the Court should disregard the Blackburns' November 29, 2011 letter "because it was an improper attempt by Plaintiffs' counsel to contact [BAC] directly . . . in violation of Georgia Rule of Professional Conduct 4.2."  Def.'s Mem. 29.  BAC does not point to, nor is the Court aware of, any authority standing for the proposition that a potential professional conduct issue excuses compliance with RESPA.

Consent by contract may be a complete defense to a trespass. *Tacon v. Equity One, Inc.*, 280 Ga. App. 183, 188, 633 S.E.2d 599, 604 (2006). However, the Blackburns never consented to any trespass on their property. They did agree to reasonable inspection of their property, but nothing in their agreement suggests that BAC would be allowed carte blanche authority to surreptitiously enter onto their property when their loan payments were current. T. Blackburn Dep. Ex. A-1, Mortgage ¶ 7, ECF No. 58-2.

The Blackburns point to evidence that BAC's agents entered onto their property repeatedly, excessively, intrusively, by deception, and without justification. *See, e.g.*, T. Blackburn Dep. 135:8-136:18, 138:3-25 (discussing the inspectors' entries on the property and one inspector's use of a false identity); S. Blackburn Dep. 78:1-81:15 (stating the inspectors repeatedly returned to the property, peered in the windows, and stuck pieces of paper in the front door). Accordingly, the Blackburns have pointed to sufficient evidence to create a genuine dispute of material fact as to whether BAC's entries on the property were "reasonable" and thus consented to under the mortgage.

Moreover, the existence of a contract between the parties does not foreclose the Blackburns' trespass claim. Where a defendant breaches an independent "duty imposed by law and not merely . . . a duty imposed by the [parties'] contract itself,"

"the breach of that duty gives rise to a cause of action in tort." *Waldrip v. Voyles*, 201 Ga. App. 592-94, 411 S.E.2d 765, 767-68 (1991).  Here, the duty not to trespass did not arise from the contract itself, notwithstanding the fact that the contract could be used to establish a defense of consent to the tortious intrusion. *Tacon*, 280 Ga. App. at 188, 633 S.E.2d at 604.  The duty here arises from case law which is also codified by statute—O.C.G.A. § 51-9-1. *Cf. J.M.I.C. Life Ins. Co. v. Toole*, 280 Ga. App. 372, 375, 634 S.E.2d 123, 127 (2006).  For these reasons, the Court denies BAC's summary judgment motion as to the trespass claim. *See Sheppard v. Yara Eng'g Corp.*, 248 Ga. 147, 148-150, 281 S.E.2d 586, 587-88 (1981) (denying summary judgment where the parties' contract did not authorize the trespass or conversion alleged and the defendant had duties independent of the parties' contract not to commit those torts).

**III. Conversion**

The Blackburns claim that BAC converted their money by taking unexplained fees from their mortgage payments and not applying their entire payments to their loan principal and interest.  BAC seeks summary judgment on this claim, arguing that the Blackburns have no basis for a conversion claim because BAC corrected the account as "if no fees had ever been charged." Def.'s Mem. 34-35.

To state a conversion claim under Georgia law, the party alleging conversion must show that the defendant refused to return the property or actually converted the property by "[a]ny distinct act of dominion and control wrongfully asserted over another's personal property, in denial of . . . or inconsistent with" its right of ownership. *Williams v. Nat'l Auto Sales, Inc.*, 287 Ga. App. 283, 285-86, 651 S.E.2d 194, 196-97 (2007) (alteration in original) (internal quotation marks omitted). The Blackburns maintain that when BAC failed to properly credit their payments, BAC wrongfully took control and dominion over their money in a manner that was inconsistent with their ownership of those funds. Genuine issues of material fact exist to be tried as to whether such conduct by BAC constitutes the intentional tort of conversion. *See, e.g.*, *Rourk v. Bank of Am. Nat'l Ass'n*, No. 4:12-CV-42 (CDL), 2012 WL 3745953, at *6 (Aug. 28, 2012) (holding that plaintiff stated a viable claim for conversion under Georgia law based on the bank's alleged unlawful collection of fees and expenses from plaintiff); *James v. Litton Loan Servicing, L.P.*, No. 4:09-CV-147 (CDL), 2011 WL 59737, at *12 (Jan. 4, 2011) (finding that plaintiffs stated a viable claim for conversion under Georgia law based on the bank's alleged misapplication of plaintiffs' loan payments).

BAC argues that even if the Blackburns can establish the essential elements for a conversion claim, the undisputed

evidence shows that their payments were eventually credited properly, and therefore, they cannot show that they have suffered any damages proximately caused by the alleged conversion. Since the Blackburns' payments were eventually credited properly and they were reimbursed for any erroneous charges, the Blackburns do not have a claim for these damages. Instead, they seek damages for the emotional distress they suffered because of the conversion. BAC argues that emotional distress damages are not recoverable under Georgia law for the intentional tort of conversion. To recover such damages, BAC maintains that the Blackburns' only remedy is to pursue a claim for the intentional infliction of emotional distress ("IIED"), a claim that the Blackburns do not assert and could not prove given the stringent requirements for succeeding on such a claim.

The Court has located no decision by the Georgia appellate courts squarely addressing whether emotional distress damages proximately caused by an intentional conversion of property are recoverable. The Georgia Reports are replete with decisions allowing for the recovery of emotional distress damages proximately caused by other types of intentional torts. The Blackburns rely on these cases, arguing that no rational basis exists for distinguishing between the intentional tort of conversion and other intentional torts on the issue of the recoverability of emotional distress damages. *See, e.g.,*

*Hamilton v. Powell, Goldstein, Frazer & Murphy,* 252 Ga. 149, 149, 311 S.E.2d 818, 819 (1984) (explaining in dicta that mental distress damages may be recovered in a legal malpractice case without proof of physical injury if conduct rises to the level of intentional tort); *Stewart v. Williams*, 243 Ga. 580, 582, 255 S.E.2d 699, 701 (1979) (concluding that mental pain and suffering are recoverable for the intentional tort of false imprisonment even absent physical injury); *Montega Corp. v. Hazelrigs*, 229 Ga. 126, 126-27, 189 S.E.2d 421, 422-23 (1972) (affirming an award of damages for mental illness and mental pain and suffering caused by an intentional trespass); *Zieve v. Hairston*, 266 Ga. App. 753, 759-60, 598 S.E.2d 25, 32 (2004) (concluding that emotional damages, including embarrassment and ridicule flowing from alleged fraudulent representations, constitute actual damages sufficient to support a fraud claim); W*right v. Wilcox*, 262 Ga. App. 659, 662, 586 S.E.2d 364, 366-67 (2003) (same as *Montega Corp.*); *St. Paul Fire & Marine Ins. Co. v. Clark*, 255 Ga. App. 14, 21-22, 566 S.E.2d 2, 9-10 (2002) (same as *Zieve*); *Chamberlin Co. of Am. v. Mays,* 92 Ga. App. 173, 174-75, 88 S.E. 2d 176, 177-78 (1955) (finding that damages for injury to health, humiliation, and distress are recoverable for the intentional tortious conduct of unlawfully levying on plaintiff's personal property and removing it from her home and noting that such recovery may be made for a willful and

intentional tort even if the tort is directed to plaintiff's property rights).[8]   The Blackburns also observe that courts from other jurisdictions have held that emotional distress type damages proximately caused by the intentional tort of conversion are recoverable.   *See, e.g.*, *Ford v. St. Louis Metro. Towing, L.C.*, No. 4:09cv0512 TCM, 2010 WL 618491, at *15 (E.D. Mo. Feb. 18, 2010) (stating that Missouri courts permit emotional distress damages "arising out of" the intentional tort of conversion); *Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454, 467 (Ill. App. Ct. 2004) ("[P]laintiffs did not allege that the defendant committed the independent tort of intentional infliction of emotional distress, and they need not have done so.  Instead, the plaintiffs sought damages for emotional distress, which may be recovered from a defendant who committed the intentional tort of conversion.") (citation omitted); *Fredeen v. Stride*, 525 P.2d 166, 168 (Or. 1974) ("[I]f mental suffering is the direct and natural result of the conversion, the jury may properly consider mental distress as an element of damages."); *Sexton v. Brown*, No. 6136-4-I, 2008 WL 4616705, at *7 (Wash. Ct. App. Oct. 20, 2008) ("Because conversion is an intentional tort, if [plaintiff] proves [defendant's] actions

---

[8] Cited cases hereinafter referred to as "Pls.' Georgia Intentional Tort Cases."

were not justified, [plaintiff] may be entitled to emotional damages.").

BAC does not effectively distinguish the authority cited by the Blackburns.   Instead, BAC cites to conversion and other intentional tort cases in which some Georgia courts, without much discussion as to why, have analyzed emotional distress claims arising from intentional torts under the heightened standard for the tort of intentional infliction of emotional distress ("IIED").  *See, e.g.*, *Williams*, 287 Ga. App. at 285-88, 651 S.E.2d at 196-98 (analyzing plaintiff's separate claims for conversion and IIED); *Hardin v. City Wide Wrecker Serv., Inc.*, 232 Ga. App. 617, 619, 501 S.E.2d 548, 550-51 (1998) (same); *Evans v. Willis*, 212 Ga. App. 335, 336-37, 441 S.E.2d 770, 772-73 (1994) (reviewing trial court's decision on plaintiff's IIED claim in a case that also involved a conversion claim); *see also DeGolyer v. Green Tree Servicing, L.L.C.*, 291 Ga. App. 444, 449, 662 S.E.2d 141, 147-48 (2008) (analyzing emotional distress damages claim for tort of wrongful foreclosure as claim for IIED); *McCarter v. Bankers Trust Co.*, 247 Ga. App. 129, 133, 543 S.E.2d 755, 758 (2000) (same).

Since no Georgia appellate decision has been located that is directly on point, the Court must try to predict based on existing precedent how the Supreme Court of Georgia would answer the following question: can a plaintiff recover emotional

24

distress damages from a defendant if the plaintiff proves that the defendant intentionally converted plaintiff's property and that the conversion proximately caused plaintiff emotional distress, or must a plaintiff prove the elements for the tort of IIED to recover such emotional distress damages?  Although the answer to this question should be readily apparent, the case law surrounding the tort of IIED creates confusion.  An examination of the origin of the IIED claim in Georgia and its evolution provides some clarity.

The recovery of emotional distress damages caused by intentional tortious conduct has long been recognized in Georgia.  Over a century ago, the Court of Appeals of Georgia, in what may be the first detailed discussion of the issue by the Georgia appellate courts, laid down the general principle that has been cited in many subsequent decisions:

> While mental suffering, unaccompanied by injury to purse or person, affords no basis for an action predicated upon wrongful acts, merely negligent, yet such damages may be recovered in those cases where the plaintiff has suffered at the hands of the defendant a wanton, voluntary, or intentional wrong the natural result of which is the causation of mental suffering and wounded feelings.

*Dunn v. W. Union Tel. Co.,* 2 Ga. App. 845, 59 S.E. 189, 189 (1907).  In *Dunn,* a customer of a telegraph company was ordered out of the office while being insulted and humiliated with abusive language.  *Id.*  Since the customer suffered no injury to

"his purse or person," the question arose as to whether he could recover compensatory damages for his humiliation and wounded feelings. *Id.*, 59 S.E. at 190. The Court of Appeals of Georgia found that he could. *Id.*, 59 S.E. at 191-92. The Court noted that it is undisputed that damages for mental suffering are compensatory in character, explaining that "'[w]ounding a man's feelings is as much actual damage as breaking his limbs.'" *Id.*, 59 S.E. at 191 (quoting *Head v. Ga. Pac. Ry. Co.,* 79 Ga. 358, 360, 7 S.E. 217, 218 (1887)). The court viewed proximate cause as the limiting condition on the recovery of such damages:

> Such damages may in the very nature of things be just as proximately and naturally the consequence of the defendant's wrong as any other damage . . . Of course, there may be cases where mental suffering is not a proximate and natural result of an injury; but this is true as to any other form of damage. Nor can it be justly said that an allowance for mental suffering is any more speculative or conjectural than damages for physical pain and suffering.

*Id.*

The court rejected the cases which precluded recovery of damages for mental suffering when no other injury is shown, finding that any such rule is "arbitrary." *Id.* The court, however, did recognize the general rule, albeit "arbitrary," that recovery for mental suffering alone was not permitted if the mental injury is the result of mere neglect. *Id.* Notwithstanding this general principle, the court emphasized that even the courts which had followed it did not extend it "to

those intentional injuries of which insult, humiliation, and mental suffering are the natural consequences." *Id.* Thus, the court made it clear that damages for emotional distress are recoverable if proximately caused by an "intentional tort," even though they may not be recoverable if caused by mere negligence. *Id.*

Subsequent to *Dunn*, many cases were decided based on the general principle that emotional distress damages proximately caused by an intentional tort were recoverable under Georgia law. *See, e.g.*, Pls.' Georgia Intentional Tort Cases. During this time, the Georgia courts began addressing more specifically the circumstances where a person could recover emotional distress damages caused by intentionally wrongful conduct that may not have previously been labeled as a well-recognized intentional tort. In *Georgia Power Co. v. Johnson*, the Court of Appeals gave this tort a name. 155 Ga. App. 862, 274 S.E.2d 17 (1980). The court explained, "[w]hile we are not familiar with the tort of 'outrage,' Georgia does recognize a cause of action for intentional infliction of emotional distress." *Id.* at 863, 274 S.E.2d at 18 (citing *Dunn,* 2 Ga. App. 845, 59 S.2d 189)*.* Rejecting the plaintiff's claim, the court observed that the precedent that had recognized such claims involved actions that were "so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff." *Id.* It was still not

27

clear from this decision whether the Court of Appeals of Georgia intended for all claims asserting mental distress damages to be treated as claims for the separate IIED tort, or whether an IIED claim existed to fill in the gap where the conduct was clearly wrongful but was not covered by any other well-established tort. Simply put, the question remained: does the tort for IIED supplement existing tort law, allowing for a claim to address wrongful conduct not covered by other traditional torts, or does it supplant all torts seeking emotional distress type damages for intentionally tortious conduct?

Following *Georgia Power Co. v. Johnson,* the Court of Appeals of Georgia decided to put more meat on the bones of the tort of IIED. In *Bridges v. Winn-Dixie Atlanta, Inc.*, the court, relying on cases from other jurisdictions and the Restatement (Second) of Torts (1965), specifically articulated the four elements for IIED, which are well recognized by Georgia courts today: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. 176 Ga. App. 227, 230, 335 S.E.2d 445, 447 (1965) (citing *Womack v. Eldridge,* 215 Va. 338, 341-42, 210 S.E.2d 145, 147-48 (1974)). This refinement of the tort of IIED, however, still did not address the issue of whether these elements must

be present any time a plaintiff seeks emotional distress damages without proof of a physical injury even if the plaintiff can establish the elements of another well-established intentional tort.

The existing case law does not clearly answer this question.  As previously described, some decisions find that if an intentional tort has been committed, then the victim of that tort can recover emotional distress type damages proximately caused by the intentionally wrongful conduct.  Other courts, however, seem to brush over the existence of a well-established intentional tort and suggest that the tort for IIED supplants all other intentional torts when emotional distress damages are sought.  The Court concludes that the better-reasoned cases are those that treat the tort of IIED as a separate cause of action, and thus allow emotional distress damages for well-recognized intentional torts when the plaintiff proves the essential elements of the well-established tort and that the intentionally tortious conduct proximately caused the emotional distress damages.

The Court finds the Supreme Court of Georgia's decision in *Hamilton v. Powell, Goldstein, Frazer & Murphy,* 252 Ga. 149, 311 S.E.2d 818 (1984) instructive.  In *Hamilton,* the Supreme Court of Georgia confirmed, albeit in dicta, that damages for mental distress may be recovered for intentional misconduct without

proof of physical injury. *Id.* at 149, 311 S.E.2d at 819. Moreover, the Court clearly indicated that damages for mental pain and anguish caused by an intentional tort were recoverable under Georgia law. *Id.* Therefore, it appears clear from this persuasive dicta from the Georgia Supreme Court that a plaintiff may recover emotional distress damages proximately caused by an intentional tort and is not required to carry the extra burden of establishing the elements for the separate tort for IIED.

The Court does find it appropriate to address two cases cited by BAC's counsel at the hearing on the pending motion. Those cases involved wrongful foreclosure claims seeking emotional distress damages which the Georgia Court of Appeals treated as IIED claims. *See DeGolyer,* 291 Ga. App. 444, 662 S.E.2d 141; *McCarter,* 247 Ga. App. 129, 543 S.E.2d 755. It is not clear whether the court treated those claims as IIED claims (1) because it did not view wrongful foreclosure as a well-established intentional tort, and therefore, to provide a remedy for such intentional wrongful conduct, the court resorted to the tort of IIED, or (2) because it was of the view that for all intentional torts seeking emotional distress damages, the plaintiff must also satisfy the elements for the tort of IIED. Interestingly, *McCarter,* which is relied on in *DeGolyer,* cites to *Clark v. West,* 196 Ga. App. 456, 395 S.E.2d 884 (1990), for the proposition that for a claim for emotional distress damages,

30

the plaintiff must meet all of the elements for the tort of IIED. *McCarter,* 247 Ga. App. at 133, 543 S.E.2d at 758. However, that is not the holding in *Clark*. Although the dissent in *Clark* did argue that the plaintiff should lose because he could not make out the elements for a claim for IIED, *Clark*, 196 Ga. App. at 461, 395 S.E.2d at 889 (Carley, C.J., dissenting), at least three of the judges in the majority expressly rejected this position, *id.* at 457-58, 395 S.E.2d at 886, explaining that the wrongful foreclosure claim should be treated as a claim for the intentional tort of wrongful foreclosure, not as an IIED claim. Consequently, they observed that the plaintiff did not need to meet the more stringent requirements of an IIED claim. *Id.* The Court recognizes that was not the holding, but it demonstrates continued confusion by the Court of Appeals of Georgia as they have grappled with this issue.

These conflicting opinions in cases decided by the Court of Appeals certainly muddy the water as to where the Court of Appeals stands on the issue. But, the limited precedent from the Supreme Court of Georgia, which this Court must follow, seems to be clear. As noted previously, the Supreme Court of Georgia has stated that a plaintiff may recover emotional distress damages by proving that the damages were proximately caused by an intentional tort. *Hamilton,* 252 Ga. at 149, 311 S.E.2d at 819; *see also* Stewart, 243 Ga. at 582, 255 S.E.2d at

701 (concluding, without mentioning any requirement of proving elements of IIED, that emotional distress damages are recoverable on claim for intentional tort of false imprisonment even if plaintiff alleged no physical injury). This Court understands that in those cases where there is no other established intentional tort alleged to cover the wrongful conduct, the available remedy for the wrongful conduct may be the tort of IIED. But, in those cases where a plaintiff alleges a well-established intentional tort, such as conversion, no persuasive reason exists to require that a plaintiff's claim be supplanted by one which that plaintiff did not choose to pursue. Accordingly, the Court concludes that under Georgia law the Blackburns may recover emotional distress damages proximately caused by BAC's intentional conversion of their money, and BAC's motion for summary judgment as to this claim is denied.[9]

## IV. Breach of Contract

BAC argues that it is entitled to summary judgment on the Blackburns' claims for emotional distress and punitive damages related to its alleged breach of contract. It is clear that a plaintiff cannot recover punitive damages or emotional distress damages for a breach of contract under Georgia law. *Hardwick v. Williams*, 265 Ga. App. 752, 752 & nn. 1-2, 595 S.E.2d 596, 597 &

---

[9] The Court also observes that the Blackburns, alternatively, may recover nominal damages as part of their conversion claim. *See Dierkes v. Crawford Orthodontic Care, P.C.,* 284 Ga. App. 96, 99-100, 643 S.E.2d 364, 368-69 (2007).

nn. 1-2 (2004).   To the extent that the Blackburns seek such damages for breach of contract, BAC's motion for summary judgment is granted as to those claims.

## V.   Punitive Damages

Having found that genuine factual disputes exist as to whether BAC may be liable for compensatory damages proximately caused by its alleged intentionally tortious conduct, the Court finds that genuine factual disputes also exist as to whether such conduct would subject BAC to punitive damages.   *See* O.C.G.A. § 51-12-5.1(b) (Georgia law authorizes the imposition of punitive damages "only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."). Although BAC argues that it made a simple mistake, the Blackburns have pointed to evidence from which a jury could conclude that after the mistake was brought to BAC's attention BAC callously demonstrated a conscious indifference to the consequences of failing to adequately address the problem.   A jury question exists as to whether this conduct warrants punitive damages.   Accordingly, BAC's motion for summary judgment as to the punitive damages claim is denied.

CONCLUSION

For the reasons set forth above, the Court denies BAC's Motion for Summary Judgment (ECF No. 61) as to the Blackburns' RESPA claim, trespass claim, conversion claim, and punitive damages claim connected to the trespass and conversion claims. BAC's motion is granted as to the Blackburns' emotional distress and punitive damages claims arising from breach of contract.


IT IS SO ORDERED, this 27th day of December, 2012.

                         S/Clay D. Land
                         ─────────────────────────
                              CLAY D. LAND
                         UNITED STATES DISTRICT JUDGE